IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MARK TETEAK,

                Plaintiff,                OPINION AND ORDER

    v.

                                           20-cv-878-wmc

KILOLO KIJAKAZI, Acting Commissioner of
Social Security,

                Defendant.

Pursuant to 42 U.S.C. § 405(g), plaintiff Mark Teteak seeks judicial review of the Social Security Commissioner's final determination, which upheld the opinion of Administrative Law Judge ("ALJ") Ahavaha Pyrtel that Teteak was not disabled. On appeal to this court, plaintiff maintains that the ALJ erred in three core respects: (1) by failing to ensure that the vocational expert's testimony was reliable; (2) by improperly dismissing the opinion of psychological consultative examiner Peggy Dennison, Ph.D.; and (3) by "playing doctor" and substituting her own findings for that of the state agency psychologists. On August 25, 2021, the court held a telephonic hearing on plaintiff's appeal at which the parties appeared by counsel. For the reasons that follow, the court agrees that the ALJ did not ensure that the VE's testimony was reliable and will remand accordingly.

BACKGROUND[1]

A. Overview

Plaintiff Mark Teteak has at least a high school education, is able to communicate in English, and has past medium/heavy exertional work experience as an auto body technician. Teteak has not engaged in substantial gainful activity since February 3, 2016, the same date as the amended, alleged onset of disability. Teteak applied for social security disability benefits on September 24, 2014, and for supplemental security income on August 8, 2018. For purposes of his social security disability benefits application, his date last insured was December 31, 2017.

With a birth date of September 14, 1974, by the court's math, Teteak was 41 years old at his amended disability onset date, and accordingly, is defined as a younger individual. 20 C.F.R. §§ 404.1563, 416.963.[2] In his application, Teteak specifically claimed disability based on malignant tumor of left testis; cancer of the lymph nodes (stage unknown); chronic low back pain; "tibula"[3] fracture; and kidney stones. (AR 82.)

B. ALJ Decision

ALJ Pyrtel held a video hearing on February 11, 2020, at which Teteak appeared both personally and by counsel, Attorney Dana Duncan, who is also representing him on

---

[1] The following facts are drawn from the administrative record, which can be found at dkt. #11.

[2] The ALJ stated in her opinion that Teteak was 37 years old on the alleged disability onset date. (Dkt. #30.) Plaintiff does not raise this error in his appeal, likely because he still falls within the "younger individual" category, and, therefore, the error was harmless.

[3] The record reflects that Teteak fractured his tibia and fibula of his left leg on February 3, 2016. (AR 561.)

appeal. On March 2, 2020, the ALJ issued an opinion finding that Teteak had not been under a disability within the meaning of the Social Security Act from his alleged onset date of February 3, 2016, through the date of the opinion. The ALJ first determined that Teteak had the following severe impairments: "lumbar spine degenerative disc disease (DDD) and depressive disorder." (AR 22.) At the same time, the ALJ found that a number of plaintiff's other physical and mental impairments were not severe, none of which Teteak challenges on appeal. (AR 23-25.) The ALJ also found that Teteak's impairments or combination of impairments do not meet or medical equal a listing, which Teteak also does not challenge in this appeal. (AR 25-26.)

The ALJ further found that Teteak had the residual functional capacity ("RFC") to perform sedentary exertional work with additional, exertional restrictions, including that he "can frequently stoop," "can occasionally climb ladders, ropes, or scaffolds," and "can only occasionally work at unprotected heights and with moving mechanical parts." (AR 26.) In addition, the ALJ found Teteak has the following nonexertional restrictions: "able to perform simple, routine and repetitive tasks but not at a production rate pace (e.g. assembly line work)"; "able to occasionally interact with supervisors, coworkers, and the public"; and "able to tolerate few changes in a routine work setting." (*Id.*)

The ALJ also reviewed plaintiff's testimony about the extent of his own, perceived limitations, including that he "has a bad back, his knee gives out, he is unable to sit or stand for long, he gets short of breach, is always fatigued, and he needs to use the bathroom frequently," in addition to his testimony about being limited to lifting only up to five pounds and not repeatedly, along with his need to use a cane. (AR 27.) Similarly, the ALJ

3

recounted plaintiff's testimony about his mental functional abilities, including that he is "very forgetful, has difficulty concentrating, has to reread things 2-3 times, gets irritated and frustrated with people, and has trouble feeling claustrophobic and with loud noises." (*Id.*) However, the ALJ, however, discounted much of plaintiff's testimony on the basis that his claimed limitations were not entirely consistent with the record evidence. In particular, the ALJ noted that a number of Teteak's complaints -- "dizziness, ears ringing, shortness of bath, frequent bathroom breaks, his knee giving out" -- are not "consistently documented in the record." (AR 27.) The ALJ further noted that there is nothing to reflect the need to use a cane or other assistive device, that he is unable to pay attention for more than five minutes at a time or that he needs assistance following written instructions. (*Id.*)

With respect to his back pain in particular, the ALJ noted that these complaints first surfaced years after the alleged amended onset date and that the medical record describes normal gait and normal musculoskeletal examinations. (AR 28.) The ALJ further noted that a lumbar x-ray in 2018 showed "minimal degenerative changes," and 2019 imaging showed only a "partial sacralization of the transitional L6 segment, moderate to severe disc narrowing," which did not preclude him from engaging in sedentary work. (*Id.*) The ALJ supported her latter finding based on the lack of significant treatment history, including (1) Teteak's report that his pain was adequately controlled by Tylenol and Aleve in January 2019, and (2) his report of pain at physical therapy caused by "having performed heavy bodywork in a bad posture and working on concrete." (*Id.*)

As for the severity of Teteak's depression diagnosis, the ALJ concluded that his statement that he "did not pursue treatment due to insurance is not fully consistent with

4

the record." (AR 28.) More specifically, the ALJ pointed out that office visit notes do not include complaints about mental health issues, including a January 2019 note in which his "screening for distress was rated at a '0'." (*Id.*) Moreover, the ALJ noted that Teteak denied any overwhelming feelings of depression, and his mental status examinations were unremarkable. (*Id.*)

The ALJ next reviewed the medical opinion evidence in the record, beginning with the consultative mental health examination by Peggy Dennison, Ph.D., who concluded that Teteak had "moderate to marked" limitations in the ability to understand remember and carry out simple instructions and in the ability to respond appropriately to supervisors and coworkers. (AR 799.) However, the ALJ noted that Dr. Dennison's psychological observations included that Teteak "had no gait or balance issue, no apparent auditory or communication impairment, that he was able to express himself well, he had no anxiety, and he had normal memory, good recall, was able to follow a 3-step command, and had no difficulty following the conversation." (AR 29.) From this, the ALJ concluded that "the claimant did not pursue treatment to support the severity of his allegations, and when he presented for consultative evaluation, the observations also did not support his allegations." (*Id.*) Accordingly, the ALJ rejected Dennison's findings of any marked psychological limitations, while finding moderate limitations to be "generally persuasive." (*Id.*)

In contrast, the ALJ found the opinions of the state agency psychological consultants' opinions "generally persuasive." (AR 29.) Specifically, she explained that

> The record, including the objective examination during consultative examination did not document abnormality in

5

>cognition, memory or concentration that would prevent simple, routine and repetitive tasks. His need for being off task was assigned given a difficulty concentrating, but the claimant was able to concentrate and follow conversation and testing at the evaluation. This is accommodated in precluding the claimant from fast-paced work. The limitation to occasional interaction accounts for the limitation to having minimal interactions. The limitation to minimal changes is accounting in limiting him to few changes in a routine work setting.

(AR 30.)

Ultimately, the ALJ gave partial weight to the state agency medical consultants opinions, finding them "somewhat persuasive," but concluding that a sedentary exertion level was more appropriate under some of the updated imaging. (AR 29.) Accordingly, with the assistance of the vocational expert ("VE"), the ALJ concluded that Teteak could not perform his past work as an auto body technician because that was a medium/heavy exertional job, while he could perform the following three jobs: surveillance system monitor, representative DOT 379.367-010, with approximately 70,000 jobs in the United States; lamp shade assembler, representative DOT 739.684-095, with approximately 60,000 jobs in the United States; and machine tender, representative DOT 731.685-014, with approximately 180,000 jobs in the United States.

As the ALJ acknowledged in her decision, Teteak's counsel objected to these job numbers on the basis that the VE's method was not sufficiently reliable. Material to Teteak's challenge, the VE testified as follows:

>Q [Attorney Duncan]: Okay. All right. Lastly, what's the source of the numbers that you cited today?
>
>A U.S. Department of Labor's national website, Counsel.

> Q And does not the U.S. Department of Labor categorize job estimates by DOT number?
>
> A They classify by SOC code.
>
> Q And how did you translate those numbers from SOC code to the DOT numbers that you estimates today?
>
> A When I look at these different jobs and the SOC codes, what I do is look at the numbers the U.S. Department of Labor Bureau of Labor Statistics gather, and then typically I make a reduction of those numbers based on my experience, so that I don't necessarily overstate the -- what the incidence of those jobs would be in the work force.
>
> Q Okay. And so . . . what is it in your experience that gives you the ability to estimate numbers at the national level
>
> A Given . . . numbers that the Department of Labor put[s] out either state wide or . . . nationally, and knowing that those numbers exist and they're widely accepted by governments and business and companies and so forth, so by reducing that, I'm quite comfortable that the numbers are not overstated either by the government or by, you know, my estimates when I do this.
>
> Q Is there any scientific or statistical basis for the method you use?
>
> A No, I don't have a -- I don't have a scientific formula that, you know, I've gotten from anybody. There's no such thing the government talks about. They just, you know, they indicate these numbers in -- in the work force based on the statistical inference that they gather -- how they gather those numbers, and then I just reduce the number so that it's not overstated when I give my work.

(AR 75-76.) In her decision, the ALJ concluded that an objection to the VE's methodology lacked merit because "[t]his practice, of providing job numbers for a general occupational title within that category, was specifically approved by the Seventh Circuit in *Weatherbee v. Astrue*, 649 F.3d 565 (7th Cir. 2011)." (AR 32.)

7

OPINION

The standard by which a federal court reviews a final decision by the Commissioner of Social Security is well-settled. Findings of fact are "conclusive," so long as they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Provided the Commissioner's findings under § 405(g) are supported by such "substantial evidence," this court cannot reconsider facts, re-weigh the evidence, decide questions of credibility, or otherwise substitute its own judgment for that of the ALJ. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Similarly, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the Commissioner. *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993). At the same time, the court must conduct a "critical review of the evidence," *id.*, and insure the ALJ has provided "a logical bridge" between findings of fact and conclusions of law. *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018). Thus, plaintiff's three, core challenges on appeal must be considered under this deferential standard, which the court will address in turn.

**I. Reliability of VE's Job Numbers**

The focus of plaintiff's appeal is on his challenge to the ALJ's reliance on the VE's job numbers for the three jobs that she found plaintiff could perform. In *Chavez v. Berryhill*, 895 F.3d 962 (7th Cir. 2018), the Seventh Circuit held that the ALJ's reliance on a VE's job estimates is based on substantial evidence only if the job estimates are the "product of a reliable method." *Id.* at 968. While this is not an "overly exacting standard," and there

8

is no requirement of a specific method for approaching this approximation;" still, "any method that the agency uses to estimate job numbers must be supported with evidence sufficient to provide some modicum of confidence in its reliability." *Id.* at 968-69. More recently, in *Brace v. Saul*, 970 F.3d 818 (7th Cir. 2020), the court revisited the reliability requirement, finding that a VE's "[t]estimony that incants unelaborated words and phrases such as 'weighting and allocation' and 'my information that I have' cannot satisfy the substantial-evidence standard." *Id.* at 822.

As described above, the VE relied on reliable Department of Labor's Occupational Employment statistics. As he acknowledges, and as the Seventh Circuit explained in *Chavez*, however, that publication "does not use the DOT job grouping system, but instead relies upon another classification system, the Standard Occupational Classification (SOC)." *Chavez*, 895 F.3d at 965. Identifying jobs that the claimant can confirm based on DOT numbers and number of jobs based on SOC code, however, creates a "matching problem: a one-to-one correlation does not exist." *Id.* Accordingly, vocational experts, either need to rely on other sources of data that perform this "crosswalk" analysis or otherwise distribute the SOC job numbers across DOT numbers.

When asked to explain how he derived the numbers, the VE simply testified that he relied on his experience, attempting to provide assurance that he had reduced the numbers to such an extent as to ensure their reliability. However, the VE fails to explain how his experience would assist him in dividing up SOC job numbers among numerous DOT numbers falling within a particular SOC. When pressed by plaintiff's counsel to explain how his experience alone enables him to determine job numbers at the DOT level,

the VE arguably provided the very same "unelaborated words and phrases" that the Seventh Circuit criticized in *Brace*, 970 F.3d at 822. In particular, the VE testified verbatim as to his experience giving him "the ability to estimate numbers at the national level" as follows:

> Given -- well given my -- given numbers that the Department of Labor doe[s] -- they put out either state wide or either nationally, and knowing that those numbers exist and they're widely accepted by governments and business and companies and so forth, so by reducing that, I'm quite comfortable that the numbers are not overstated either by the government or by, you know, my estimates when I do this.

(AR 75-76.) During the hearing, the counsel for the Commissioner acknowledged some ambiguity in the VE's testimony.

As in *Brace*, this answer provides little confidence that the VE was capable of meaningfully translating national SOC job numbers into DOT jobs, much less estimate actual availability of those jobs. Especially in light of plaintiff's objection, therefore, the ALJ was arguably required to seek additional information from the VE to ensure the reliability of his job numbers. *See Brace*, 970 F.3d at 823 ("Evidence is not 'substantial if vital testimony has been conjured out of whole cloth." (quoting *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002)). To be fair, the VE testified that there were 120,000 lamp shade assembler jobs in the national economy, but based on the "no production" nonexertional restriction, the VE "edit[ed] the number down to half to about 60,000 to make sure that there was [not] any cites to goal-oriented production rather than production assembly type things." (AR 69.) This testimony properly reflects the use of experience in determining job numbers for the specific RFC, but the VE does not explain how he arrived

at the 120,000 job number based on the lamp shade assembler, with a DOT of 739.684-094.

In his brief, plaintiff attempts to demonstrate why estimating job numbers by DOT may be material in this case, listing the job title, DOT code, VE's testimony about the number of jobs for each job title, the corresponding SOC code, the BLS [Bureau of Labor Statistics] number per SOC code, and the number of DOT codes per SOC code. (Pl.'s Opening Br. (dkt. #14) 16-17.) Unfortunately, the cite provided is to a website https://www.onetonline.org/crosswalk/DOT/ that does not provide all of the information cited. More critically, at least some of the information is plainly incorrect. For lamp shade assembler, plaintiff provides the DOT code 731.685-014, which is the wrong code; as noted, the DOT code is 739.684-094. That code in turn references three SOC numbers, none of which are listed in plaintiff's chart. Moreover, for the surveillance system monitor, DOT 397.367-010, plaintiff lists an SOC code of 37-2012, which corresponds to maids and housekeeping cleaners. At most, plaintiff's evidence that the reliability of VE's numbers was harmful to his disability claim falls flat.

For her part, the Commissioner criticizes plaintiff's use of "'SOC code' and 'BLS data'" as an "attempt to obfuscate the issues with extra-record evidence and lay speculation." (Def.'s Opp'n (dkt. #16) 25.) However, this argument is similarly unhelpful. As the court explained in *Chavez*, the VE, and in turn the ALJ, must grapple with data to determine a reliable number of available jobs, as identified by DOT number that the claimant could perform given the ALJ's RFC.

Perhaps most useful is the ALJ's own citation to *Weatherbee v. Astrue*, 649 F.3d 565 (7th Cir. 2011), in which the Seventh Circuit excused the VE's reliance on job numbers for an SOC rather than a specific DOT number because the SOC code had "140,000 of these positions available nationally—numbers well above the threshold for significance." *Id.* at 572. In other words, the Seventh Circuit concluded that the VE's use of job numbers based on an SOC code rather than a DOT code is harmless when the universe of available jobs nationally are well above a "significant threshold." Neither party, however, cited *Weatherbee* in their briefs, defendant does not argue that any error was harmless, and the VE did not articulate his expert opinion based on some acceptable, recognized significance threshold. Moreover, the Seventh Circuit's decision in *Brace* calls into question this holding in *Weatherbee* by rejecting an argument that a particularly large job number could excuse the lack of a meaningful explanation by the VE for relying on SOC numbers. *See* 970 F.3d at 823 ("An unreliable job-number estimate cannot be considered reliable merely because it is large.") (citing *Chavez*, 895 F.3d at 970).

During the hearing, the court pressed claimant's counsel as to whether remand is likely to result in a different outcome, in other words, a finding that there are no jobs in sufficient number in the national economy that Teteak could perform given the RFC crafted by the ALJ. Plaintiff's counsel maintained that a proper analysis of job numbers based on DOT code could result in a finding of disability, specifically pointing out that at least one of the SOCs at issue had hundreds if not over a thousand DOT numbers associated with it, and that the VE allotted over half the jobs in that SOC to the one DOT code at issue. On his part, counsel for the Commissioner failed to explain how any error

was harmless or otherwise argue that remand would be pointless. While the court is skeptical that remand will produce a different result, on this record, the court has no basis to find the error harmless. As such, the court agrees with plaintiff that this challenge warrants remand.

**II. Treatment of Consultative Examiner's Opinion**

Plaintiff also faults the ALJ for her treatment of the consultative examining psychologist Peggy Dennison, Ph.D. As described above, based on her November 2018 examination, Dennison concluded that Teteak had "moderate to marked" limitations in (1) the ability to understand remember and carry out simple instructions and (2) the ability to respond appropriately to supervisors and coworkers. (AR 799.) Having found a basis for remand, the court will touch briefly on the two other challenges raised in plaintiff's brief, finding no merit in either. The ALJ concluded that any finding of marked limitation was not persuasive, but that the other findings, namely moderate limitations were generally persuasive. (AR 29.)

As an initial point, Dr. Dennison did not find any marked limitations; instead, she found "moderate to marked" limitations with respect to two of the Paragraph B categories. As such, the ALJ simply rejected any finding that Teteak's mental health issues created any marked limitations while crediting Dennison's moderate findings. Moreover, the ALJ provided ample reasons for rejecting a finding of marked limitations, specifically describing that: Teteak's claimed impairments were not observed during the consultative examination; his decision not to seek treatment further called into question the severity of his depression; and the record did not support a finding of ongoing, disabling symptoms,

13

pointing to specific medical records in which Teteak reported no feelings of depression or anxiety and noting mental status examinations were also consistently unremarkable. (AR 28-29.)[4]  Accordingly, the court finds that the ALJ adequately explained her reasons for rejecting any finding of marked limitations.

**III. Determining RFC Nonexertional Limitations**

Finally, plaintiff contends that the ALJ played doctor by creating nonexertional limitations that differ from those described by the state agency psychological consultants. Here, too, the record is contrary.  The state agency psychological consultants opined that Teteak was limited to minimal changes in daily interactions; minimal interactions with others; will have difficulty with detailed instructions but is capable of simple 1-2 step tasks; and will have difficulty with concentration and will be off task 10% of the workday.  (AR 107-109; AR 144-145.)  For her part, the ALJ expressly found these opinions to be generally persuasive while discounting parts of it based on the results of the consultative examination by Dr. Dennison.

Specifically, the ALJ relied on (1) Dr. Dennison's finding that Teteak did not have an "abnormality in cognition, memory or concentration," and, therefore, concluded that he could perform "simple, routine and repetitive tasks"; and (2) Dennison's lack of finding that Teteak had any difficulty with concentration, rejecting any off-task exertional requirement, but finding that a bar from past-paced work would accommodate moderated

---

[4] Teteak faults the ALJ for not inquiring about the reasons for his lack of treatment, but this is not accurate.  She acknowledged his claimed lack of insurance, but concluded that this reason was not persuasive because his medical records note that on "numerous occasions" Teteak denied even having mental health issues.  (AR 28; AR 63.)

14

limitations in concentration, persistence and pace.  (AR 29.)  The ALJ also credited the state agency psychologists' opinion that Teteak should be limited to minimal interactions with others by crafting an RFC limiting him to "occasional" interactions.  (AR 26, 30.)  Moreover, the ALJ credited the state agency psychologists' finding that Teteak should have minimal changes in daily interactions by limiting him to a "few" changes in routine work setting.  (AR 26, 30.)  While plaintiff takes issue with the use of "occasional" rather than "minimal," and "few" rather than "minimal," he fails to develop any argument that the differences in terms were meaningful to the ALJ's ultimate findings.  Regardless, this argument is woefully undeveloped, and as such, the court rejects this challenge as well.

ORDER

IT IS ORDERED that 1)  The decision of defendant Kilolo Kijakazi, Acting Commissioner of the Social Security Administration, denying plaintiff Mark Teteak's application for disability insurance benefits and supplemental security income is REVERSED AND REMANDED under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion..

Entered this 27th day of August, 2021.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge